**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| MELISSA CURTIS,<br><br>Plaintiff,<br><br>v.<br><br>GULFSTREAM AEROSPACE CORPORATION,<br><br>Defendant. | CIVIL ACTION NO.: 4:24-cv-227 |

**O R D E R**

Plaintiff Melissa Curtis sued Defendant Gulfstream Aerospace Corporation ("Gulfstream") under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA"). (Doc. 12.) Plaintiff alleges that Defendant discriminated and retaliated against her because of her perceived disability and because she engaged in conduct protected by the ADA, Title VII, and the FMLA. (Id.) Before the Court is Defendant's Motion for Summary Judgment in which it argues, among other things, that Plaintiff has failed to raise a genuine issue of material fact on any of her claims and that Defendants had legitimate reasons for terminating Plaintiff's employment. (Doc. 22.) Plaintiff filed a Response, (doc. 27), and Defendant filed a Reply, (doc. 32). For the reasons below, the Court **GRANTS** Defendant's Motion for Summary Judgment. (Doc. 22.)

## BACKGROUND

### I. Factual Background

Plaintiff Melissa Curtis was hired by Defendant Gulfstream on December 1, 2014, as an administrative assistant. (Doc. 28, pp. 1–2.) As part of her onboarding, Plaintiff completed a form asking whether she required a reasonable accommodation to perform her job, and she marked "No." (Id. at p. 2; doc. 22-5.) Plaintiff resigned on September 11, 2015, because "it was not a positive work environment that [she] wanted to work in," and that the environment was "[v]ery high school-ish." (Doc. 28, p. 2; doc. 22-1, p. 12; doc. 22-4.) After her resignation, Plaintiff worked as an administrative assistant at Savannah College of Art & Design ("SCAD"). (Doc. 28, p. 3; doc. 22-1, p. 12.) Plaintiff left her role at SCAD because of the "work environment" and because "[m]anagement never really made it clear as to what the responsibilities were." (Doc. 28, p. 3; doc. 22-1, p. 12.) Following her resignation from SCAD, Plaintiff applied for a position with Defendant and was rehired as an administrative assistant in February 2017. (Doc. 28, p. 3; doc. 22-6.) As part of the onboarding process, Plaintiff again completed a form asking whether she required any reasonable accommodations to perform her job, and she again marked "No." (Doc. 28, p. 4; doc. 22-7.) In her application, Plaintiff indicated as part of her work history that she had been honorably discharged from the Air Force in 1997, but she did not include an explanation as to why. (Doc. 28, p. 4; doc. 22-8, pp. 6–7.) Plaintiff testified that her discharge was related to a mental health issue. (Doc. 22-1, p. 6.)

In February 2018, Plaintiff was offered a new role as a "Design Implementation Specialist" within the Advanced Project Development team. (Doc. 28, p. 8; see doc. 22-9.) In 2022, Plaintiff transitioned into a quality assurance role within Advanced Cabin Programs as a Completions Technical Specialist. (Doc. 28, pp. 8–9.) Hall, a Gulfstream employee since 2012, became the

Manager for Advanced Cabin Programs and Plaintiff's supervisor on August 22, 2022. (Id. at p. 9; doc. 22-19, p. 1.) As the Manager, Hall oversaw three teams: (1) research & development; (2) sustainability; and (3) testing/validation. (Doc. 28, p. 9; doc. 22-19, p. 1.) Plaintiff was originally in the sustainability group, which tests products still in the development phase before they go to validation. (Doc. 28, p. 10; doc. 22-19, p. 1.) In 2023, Hall changed workflows within the team and had the sustainability group train with the validation team so that the sustainability group could improve their testing skills. (Doc. 28, p. 10.) The changes led to improvements in the overall performance of the team. (Id. at p. 11.)

Hall testified that she changed the team workflows because she observed that the sustainability team and Plaintiff in particular were not meeting performance expectations. (Doc. 22-19, p. 1.) Defendant claims that "it was clear that [Plaintiff] did not have the skills she needed to effectively perform in her role," and that "she did not know enough about the airplane operating systems to be able to properly test them." (Doc. 28, p. 11–12; doc. 22-19, p. 1; doc. 22-2, pp. 63–66.) Specifically, Hall stated in her Declaration that, "on one occasion, Plaintiff did not understand how to turn on part of the operating system and therefore tested a different part of the system than the one she was assigned." (Doc. 28, p. 12; doc. 22-19, p. 1.) Plaintiff denies the claim that she had not met performance expectations in 2023 and that she failed to meet performance expectations at a level or rate exceeding any of her team members at that time. (Doc. 28, p. 10.) She contends that "Defendant fails to proffer any contemporaneous documentation supporting Hall's statements." (Id.) Plaintiff notes that the "record evidence does not show any history of poor performance on [her part] prior to being placed on a [performance improvement plan], which [she] reiterated to Hall, Outlaw, and Pollett in March 2024." (Id. at pp. 10–11 (citing doc. 27-7; doc. 27-8).)

Hall testified that she began contemplating the terms of a performance improvement plan ("PIP") for Plaintiff in January 2024. (Doc. 28, p. 13; doc. 22-19, p. 2.) On January 29, 2024, Hall heard from one of Plaintiff's coworkers that Plaintiff "was heard making comments to her peers about taking another employee for an abortion," and that Plaintiff "recorded two coworkers['] conversations after a testing session." (Doc. 28, p. 14; doc. 22-1, p. 62; doc. 22-19, p. 2.) Jennifer Outlaw, Senior People Partner, and Jason Pollett, People Partnership Manager, investigated these allegations, which included interviewing Curtis's coworkers, and found that the allegations were substantiated, and recommended a "First Counseling." (Doc. 28, pp. 15–16; doc. 22-12; doc. 22-20, p. 1; doc. 22-21, p. 1.) Plaintiff admits that she recorded two coworkers, albeit unintentionally, but denies that she made comments to her peers about taking another employee for an abortion. (Doc. 28, p. 15.) Plaintiff received a "First Counseling" on February 26, 2024, for "[i]nappropriate or unprofessional behavior," (doc. 22-2, p. 62), and she was given her PIP at the same time, (id. at pp. 63–66).

The PIP outlined areas of poor performance and certain action items and expectations. (See id.; see also doc. 28, p. 16.) The PIP states:

> During the past **12 months** it has been increasingly evident that you have not been performing your assigned work in accordance with what is expected of a **Completions Tech Spec I**. Your lack of progress in meeting expectations for a **Completions Tech Spec I** continues to have a negative impact on **Advanced Cabin Programs**. Improvement must occur immediately and must be maintained.
>
> Specific areas of concern include:
>
> 1. **Essential Functions #1 - Contributes to planning, developing and coordinating of important engineering projects**. Expectation was that by now you would be able to plan and coordinate the Red Label testing activities, however, you are not able to. Additionally, you are not able to lead any of the planning or coordination of Red Label activities.
> 2. **Essential Functions #3 - Uses advanced techniques and modified extension of theories to provide technical solutions to a wide range of difficult problems**: Although you have made progress in learning the config file

updates, you have failed to learn the major aircraft systems such as GCMS and AVDS. You are unable to demonstrate the ability to learn how to accomplish testing and troubleshooting in the ITFs. Also, you have not taken the initiative to run the test plans and ask questions when needed, instead you wait to be told what to do step by step.

3. **Essential Functions #5 - Works under limited supervision; work should only be required to be reviewed for accuracy and consistency with meeting overall objectives:** You are not currently able to perform ITF testing independently as you have not learned enough about the aircraft systems. When assigned to the One Team initiative and sent to ITF to assist in Red/Black Label testing and to learn aircraft troubleshooting skills, you did not proactively run test plans and nor did you gain the experience needed to learn any troubleshooting skills.
4. **Essential Functions #6 - Acts as liaison with representatives outside of the assigned group/area:** Currently the relationships with your team and others are strained. You are seen as unapproachable, and others will often work around you rather than collaborate with you due to concerns with how you will react. Your unprofessional comments, gossip, and actions have made others uncomfortable working with you.

The intent behind this plan is to raise the level of your performance and contribution to **Advanced Cabin Programs**. As your manager, I commit myself to coaching you through this process and providing you feedback regarding your progress. By 90 days from this discussion you are expected to:

1. Immediately familiarize yourself with the planning process. Make a plan to learn how the planning process works including the impacts of lab availability, project priorities, aircraft needs, and developer schedules. By the end of week three you will deliver to me a written plan with SMART goals that will outline how you will achieve success in these areas.
2. Immediately self-identify where you currently are and where you need to be regarding learning the various aircraft systems and how to troubleshoot them. You will develop a path to get there and by the end of week three you will deliver a written plan with SMART goals that will outline how you will achieve success in these areas.
3. Immediately stop unprofessional actions. Always engage in professional dialog with those around you to help rebuild the relationships with your team and reestablish trust with your coworkers. Over the next two weeks you will request feedback from both the ACP and the ACT group heads to gain key insights. By the end of week three you will deliver to me a written plan with SMART goals that will outline how you will use feedback given to achieve success in these areas.

. . . . At the conclusion of the Plan period, your performance will be evaluated and further improvement objectives may be considered. However, if at any time during the Plan period, you fail to meet the expectations set forth above or as required by

> your position, further disciplinary action up to and including termination may occur.

(Doc. 22-2, pp. 63–66.) Although Plaintiff signed the PIP, she did not agree with any of the criticisms or concerns identified. (Doc. 28, p. 18.) When asked whether there was anything at all that she thought she needed to improve upon at that time, Plaintiff stated, "I don't recall." (Id. at p. 19; doc. 22-1, p. 31.)

The day after signing her PIP and First Counseling, Plaintiff sent Hall and Outlaw an email reporting that she had a complaint of sexual harassment to make against her coworker, Anthony Romagnino. (Doc. 28, p. 19; doc. 22-13; doc. 22-19, p. 3; doc. 22-20, p. 2.) Plaintiff communicated verbally to Outlaw that Romagnino had been sending her sexually explicit text messages. (Doc. 28, pp. 19–20.) Romagnino was not Plaintiff's supervisor. (Id. p. 20.) Outlaw and Jason Pollett, Plaintiff's supervisor, investigated the allegations. (Id. at p. 21; doc. 22-14; doc. 22-20, p. 2; doc. 22-21, p. 3.) During the investigation, Romagnino admitted to texting Plaintiff explicit text messages. (Doc. 28, pp. 21–22; doc. 22-14; doc. 22-20, p. 3; doc. 22-21, p. 3.) On March 13, 2024, Outlaw and Pollett found that Curtis's allegations against Romagnino were substantiated and recommended that Romagnino be terminated. (Doc. 28, pp. 22–23; doc. 22-14; doc. 22-20, p. 3; doc. 22-21, p. 3.). Shortly, thereafter, Romagnino was terminated. (Doc. 28, p. 23; doc. 22-20, p. 3; doc. 22-21, p. 3.)

Plaintiff testified that her coworker, Michael Welch, told her shortly before her termination in June 2024 that he had reported her complaints of sexual harassment to management. (Doc. 28, p. 23; doc. 22-1, p. 48.) The parties dispute whether Welch reported Plaintiff's complaints to management before or after Plaintiff's own reporting. (Doc. 28, at pp. 25–27.) Plaintiff *believes* Welch reported her complaints before her February 27, 2024, report and that "no one listened to him." (Doc. 28, p. 24; doc. 22-1, p. 48; doc. 27-14.) But she did not actually know when Welch

reported her complaints or to whom he reported them. (Doc. 28, p. 25.) In his Declaration, Welch stated that he encouraged Plaintiff to report Romagnino's harassing behavior, and "[w]hen [Plaintiff] did not [report the matter]," Welch proceeded to inform Group Head Kenny Carden, who then informed Hall. (Id. at p. 24–25; doc. 22-22, p. 1.)

Plaintiff believes that Hall was angry with her over Romagnino's termination because Romagnino and Hall were "very close." (Doc. 28, p. 28; doc. 22-1, p. 23.) Plaintiff stated that she believed Romagnino and Hall were friends because "when [Hall] would come into the work area . . . she would acknowledge everybody. She rarely acknowledged [Plaintiff] even though [she] sat right there. [Hall] would talk to [Romagnino] about certain opportunities, you know, going out on the plane, actually testing, you know." (Doc. 28, p. 28; doc. 22-1, p. 23.) But Plaintiff has no evidence that Romagnino and Hall knew each other prior to 2023, when Romagnino joined the department, and she has no knowledge of whether they ever interacted outside of work. (Doc. 28, p. 29; doc. 22-1, p. 23.) Hall testified that she was not personal friends with Romagnino, she did not know Romagnino prior to his 2023 start at Gulfstream, and she felt no animus towards Plaintiff when Romagnino was terminated. (Doc. 28, p. 29; doc. 22-19, p. 4.)

On March 26, 2024, after Romagnino was terminated, Plaintiff emailed Outlaw and Pollett stating that she felt she was being retaliated against for Romagnino's termination because Hall had sent her emails on or around March 25, 2024, critical of Plaintiff's work product or recommending a different approach to a particular work task. (Doc 28, pp. 29–30; doc. 22-15; doc. 22-20, p. 3; doc. 22-21, p. 3.) Outlaw and Pollett investigated this report. (Doc. 28, p. 30.) During the investigation, Plaintiff also alleged that Hall was discriminating against her based on her status as a veteran and was "bullying her." (Id.; doc. 22-16; doc. 22-20, p. 3; doc. 22-21, p. 3.) The investigation found that Plaintiff's claims could not be substantiated. (Doc. 28, p. 31.)

Specifically, there was no evidence of discrimination based on Plaintiff's veteran status or retaliation. (Id.) After reporting her concerns about Hall, Plaintiff claims that she met with Hall's supervisor, Timothy O'Hara, for about 15 minutes and told him that she was not "getting what [she] needed to do [her] job. The expectations, the clear communications, the—just anything." (Doc. 28, p. 33; doc. 22-1, p. 52.) According to Plaintiff, O'Hara did not help her and told her that he does not micromanage his managers. (Doc. 28, p. 34; doc. 22-1, p. 52.) But O'Hara testified that the only time he met with Plaintiff one-on-one was in mid-May 2024, following a department-wide meeting in which he encouraged his employees to take advantage of his open-door policy. (Doc. 28, p. 34; doc. 22-24, pp. 1–2.) In that meeting, Plaintiff did not complain about Hall or discuss her concerns with Hall's management style. (Doc. 28, pp. 34–35; doc. 22-24, pp. 1–2.) Instead, Plaintiff asked O'Hara about potential job openings within the department. (Doc. 28, p. 35; doc. 22-24, p. 1.) O'Hara explained that Hall's group was the only group within his department that involved software testing and he did not anticipate having any openings in the near term. (Doc. 28, p. 35; doc. 22-24, p. 1.)

On April 11, 2024, Plaintiff formally requested a reasonable accommodation—the first and only time Plaintiff requested a reasonable accommodation at Gulfstream. (Doc. 28, p. 36; doc. 22-2, pp. 57–58.) Plaintiff requested an accommodation in the form of "Communication assistance with Dixie Hall—Manager." (Doc. 28, p. 37; doc. 22-3, pp. 57–58.) Plaintiff provided a letter from a counselor stating that she suffers from PTSD and "would benefit from receiving communication from her supervisor in email form with specific expectations. [Plaintiff] should be able to summarize the communication in an email back to ensure accuracy of understanding." (Doc. 28, p. 37; doc. 22-3, p. 58.)

The parties dispute whether, before her accommodation request, Plaintiff told anyone at Gulfstream that she suffered from a disability or had a mental health diagnosis that impaired her work performance. (Doc. 28, pp. 37–40.) Defendant contends that Plaintiff's Gulfstream supervisor, Dixie Hall, and Gulfstream human resources personnel who interacted with Plaintiff all state that Plaintiff never told them that she had a disability prior to her April 2024 request for an accommodation, and Plaintiff never indicated that she had a health diagnosis that impaired her ability to perform her job. (Doc. 22, p. 2 (citing doc. 22-1, p. 46; doc. 22-19, p. 7; doc. 22-20, p. 4; doc. 22-21, p. 4).) Plaintiff counters that Gulfstream employees Jennifer Outlaw, Jason Pollet, and Hall knew about Plaintiff's disability and health diagnosis "well before" Plaintiff's April 2024 reasonable accommodation request. (Doc. 28, pp. 6–8 (citing doc. 27-1, p. 1; doc. 27-2; doc. 27-3; doc. 27-4; doc. 22-21, p. 3; doc. 27-5, pp. 1, 4; doc. 27-6, p. 3).)

In conversations with human resources, Plaintiff expressed that she wanted Hall to communicate with her exclusively through email. (Doc. 28, p. 40.) Human resources explained to Plaintiff that her immediate supervisor had to be able to communicate with her verbally at times, including her bimonthly PIP meetings. (Id.) At her deposition, Plaintiff agreed that following her request for a reasonable accommodation (as well as before her request), she was allowed to send summary recap emails to Hall and Hall typically responded to these emails with comments. (Id. at p. 41; doc. 22-1, p. 45.) For example, after the biweekly meeting Plaintiff had with Hall immediately before requesting a reasonable accommodation, Plaintiff sent Hall an email outlining her takeaways from the meeting and six action items. (Doc. 28, p. 41; doc. 22-1, p. 41.) But Plaintiff "felt there should be more direction" and that Hall's responses "should have been a little bit more professionally done." (Doc. 28, p. 41; doc. 22-1, p. 45.)

At Gulfstream, FMLA leave is handled by a third-party administrator, Sedgwick. (Doc. 28, p. 42.) Employees apply for leave through a portal managed by Sedgwick, and Sedgwick handles the eligibility and approval process for each leave request. (Id.) On May 6, 2024, Plaintiff informed Outlaw and Pollett via email that she would like to start the process for short term disability and FMLA leave because the PIP process had been negatively affecting her mental and emotional state, and because of the increased medical attention she needed due to the mistreatment she experienced from Hall. (Doc. 20-17, pp. 3-4.) Plaintiff submitted an FMLA leave request to Sedgwick on May 8, 2024, to begin May 27, 2024. (Doc. 28, p. 42.) Sedgwick emailed Hall and Outlaw on the same day, notifying them that Plaintiff had made this request, that Plaintiff was eligible for leave, and that Sedgwick had requested additional paperwork from Plaintiff. (Id.; doc. 22-17.) Outlaw emailed Plaintiff on May 20, 2024, and asked Plaintiff if she had confirmed the short term disability/FMLA dates with Hall. (Doc. 27-20, p. 2.) In response, Plaintiff informed Outlaw that she would see if her FMLA start date could be adjusted to June 2024 because she needed to confirm with Hall. (Doc. 27-20, pp. 1–2.)

On May 23, 2024, Plaintiff followed up with Outlaw and Hall to inform them that she had adjusted her FMLA start date to June 17, 2024, so that she could "arrange the timeframe with [Hall]." (Id. at p. 1.) Plaintiff submitted a revision to her leave request to Sedgwick on May 29, 2024, requesting that her leave begin on June 17, 2024. (Doc. 28, p. 43; doc. 22-18.) Sedgwick notified Hall and Outlaw via email on the same day that Plaintiff submitted a revised request, that Plaintiff was eligible for the requested leave, and that Sedgwick had requested additional paperwork from Plaintiff. (Doc. 28, p. 43; doc. 22-18.) The May 8 and May 29 emails from Sedgwick did not identify why Plaintiff requested FMLA leave and Sedgwick did not

communicate further with Hall or Gulfstream human resources before Plaintiff's termination. (Doc. 28, pp. 43–44.)

It is standard practice at Gulfstream to terminate an employee if they have been placed on a PIP and their performance has not improved during the PIP period. (Doc. 28, p. 49.) At Gulfstream, supervisors draft PIPs in consultation with their human resources people partners and include reasonable expectations and tangible goals that the employee should be able to achieve. (Id.) Plaintiff's PIP laid out her essential job functions and expectations, described specific actions for Plaintiff to address immediately, and called for biweekly meetings where Hall could provide additional feedback. (Id. at p. 50; see doc. 22-2, pp. 63–66.) Hall met with Plaintiff on a biweekly basis and provided Plaintiff with feedback. (Doc. 28, pp. 50–51.) Plaintiff acknowledges that Hall gave her feedback but denies that it was regular and "admonishes the quality and clarity." (Id.) The biweekly meetings often led to additional follow-up emails between Plaintiff and Hall recapping the meetings. (Id. at p. 51.)

Plaintiff admits that her performance did not improve during the PIP period, that she was not able to perform the core function of her role, and that it was clear that she had not achieved the basic goals of the PIP when the 90-day period expired "to the extent that Defendant allegedly believed" such facts. (See doc. 28, p. 51–53.) Hall, in consultations with human resources and O'Hara, determined that Plaintiff had not met the substantive goals of her PIP and that separation was appropriate. (Id. at p. 54.) Gulfstream terminated Plaintiff on June 10, 2024. (Id.)

## II. Procedural History

Plaintiff filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 27, 2024. (Doc. 12, p. 2; doc. 12-1.) The EEOC issued its Determination and Notice of Rights on July 9, 2024. (Doc. 12, p. 2; doc. 12-2.) Plaintiff filed a

second Charge of Discrimination with the EEOC on August 19, 2024, which included additional claims against Gulfstream. (Doc. 12, p. 2; doc. 12-3.) On September 18, 2024, the EEOC administratively closed Plaintiff's second Charge. (Doc. 12, pp. 2–3; doc. 12-4.)

With Plaintiff's second Charge administratively closed, Plaintiff filed suit against Defendant on October 7, 2024. (Doc. 1.) Plaintiff's original Complaint contains causes of action from both the first and second Charges. (Id.) On November 13, 2024, the EEOC informed Plaintiff's counsel that it had administratively closed Plaintiff's second Charge under the erroneous belief that Plaintiff's second Charge was a duplicate of Plaintiff's first Charge. (Doc. 12, p. 3; doc. 12-4.) Because Plaintiff's original Complaint had already been filed, the EEOC asked Plaintiff's counsel if Plaintiff would like to request a Notice of Right to Sue from the EEOC for Plaintiff's second Charge. (Doc. 12, p. 3; doc. 12-4.) On November 15, 2024, Plaintiff's counsel informed the EEOC that Plaintiff would like to request a Notice of Right to Sue from the EEOC for Plaintiff's second Charge. (Doc. 12, p. 3; doc. 12-4.) On November 20, 2024, the EEOC issued its Notice of Right to Sue for Plaintiff's second Charge. (Doc. 12, p. 3; doc. 12-5.) Plaintiff then filed an Amended Complaint on January 21, 2025. (Doc. 12.)

In her Amended Complaint Plaintiff alleges claims for discrimination in violation of the ADA, (Count I), retaliation in violation of ADA, (Count II), interference with exercise of FMLA rights, (Count III), retaliation for exercise of FMLA rights, (Count IV), gender discrimination under Title VII, (Count V), retaliation under Title VII, (Count VI), and sexual harassment in violation of Title VII, (Count VII). (Id. at pp. 11–26.) Defendant filed the at-issue Motion for Summary Judgment arguing, among other things, that Plaintiff was terminated for a legitimate, non-discriminatory reason, and as such, summary judgment is appropriate. (Doc. 22.) Plaintiff filed a Response, (doc. 28), and Defendant filed a Reply, (doc. 32).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove her case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir.

2007)). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted). Additionally, the Court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

## DISCUSSION

### I. ADA Discrimination (Count I)

The ADA provides that no covered entity, including employers, "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring . . . or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[T]here are two distinct categories of disability discrimination claims under the ADA: (1) failure to accommodate and (2) disparate treatment." E.E.O.C. v. Eckerd Corp., No. 1:10-CV-2816-JEC, 2012 WL 2568225, at *4 (N.D. Ga. July 2, 2012). "Disparate treatment involves discriminatory animus or intent and occurs when a disabled individual is treated differently than a non-disabled or less disabled individual because of his disability." Nadler v. Harvey, No. 06-12692, 2007 WL 2404705, *4 (11th Cir. Aug. 24, 2007) (citing 42 U.S.C. § 12112(b)). "By contrast, a failure to make reasonable accommodation claim requires no animus and occurs when a covered entity fails to fulfill its affirmative duty to 'make reasonable accommodation to the known physical or mental limitations of an otherwise qualified [individual] with a disability' without demonstrating that 'the accommodation would impose an undue hardship on the operation of the business.'" Id. (quoting 42 U.S.C. § 12112(b)(5)). Plaintiff asserts both

types of claims in Count I of her Amended Complaint. (Doc. 12, pp. 11–14). The Court addresses each issue in turn.

**A. Reasonable Accommodation**

To establish a *prima facie* case with respect to a reasonable accommodation claim, "a plaintiff must demonstrate that: (1) she is disabled; (2) she is a qualified individual; and (3) that she was discriminated against because of her disability by being denied a reasonable accommodation to allow her to keep working." Bethancourt v. Wal-Mart Stores E., LP, No. 1:22-CV-4211-TWT-CCB, 2024 WL 4451754, at *14 (N.D. Ga. July 3, 2024), report and recommendation adopted, 2024 WL 4213602 (N.D. Ga. Sept. 17, 2024). "[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA**,** so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1262 (11th Cir. 2007). Assuming these requirements are met, a defendant can avoid liability under the ADA by showing that the plaintiff's accommodation would impose an "undue hardship" on its business or operations. 42 U.S.C. § 12112(b)(5)(A). For a failure-to-accommodate claim, there are no "subsequent burdens on [Defendant] to show that it had any legitimate non-discriminatory reasons for terminating [Plaintiff] or on [Plaintiff] to establish that these reasons were pretextual." Holly, 492 F.3d at 1262 (internal quotations omitted).

Defendant argues that Plaintiff's failure to accommodate claim fails because she cannot show that she had a disability under the ADA, and even if she could, the evidence shows that she was not denied a reasonable accommodation. (Doc. 22, p. 16–17.)

**(1) Whether Plaintiff Has a Disability**

Under the ADA, an individual has a disability if: (1) she has a physical or mental impairment that substantially limits one or more of her major life activities; (2) there is a record of such impairment; or (3) she is regarded as having such an impairment. 42 U.S.C. § 12102(1); see also Danielle-DiSerafino v. Dist. Sch. Bd. of Collier Cnty., 756 F. App'x 940, 943 (11th Cir. 2018). Major life activities include (but are not limited to) performing manual tasks, walking, standing, lifting, bending, speaking, concentrating, thinking, communicating, and working, as well as the operation of a major bodily function, including brain function. 42 U.S.C. § 12102(2); see also EEOC v. ZOe Ctr. for Pediatric & Adolescent Health, LLC, No. 4:23-CV-167, 2025 WL 1788973, at *7 (M.D. Ga. June 27, 2025). Whether an individual is substantially limited in a major life activity is judged in comparison to "most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii); see ZOe Ctr., 2025 WL 1788973, at *7. Defendant does not dispute that Plaintiff has mental impairments, including PTSD and anxiety; rather, it argues that Plaintiff's impairments did not substantially limit any of her major life activities. (Doc. 22, pp. 14–16.)

"Congress amended the ADA by enacting the ADA Amendments Act of 2008 (the 'ADAAA') with the goal of broadening the interpretation of a disability under the ADA." Lewis v. City of Union City, 934 F.3d 1169, 1180 (11th Cir. 2019). Consequently, the statute now instructs that the definition of disability "shall be construed in favor of broad coverage of individuals." ZOe Ctr., 2025 WL 1788973, at *7 (quoting 42 U.S.C. § 12102(4)(A)). "These amendments convey that an extensive analysis is not required to determine whether an individual's impairment is a disability under the ADA." EEOC v. St. Joseph's Hosp., Inc., 842 F.3d 1333, 1343 (11th Cir. 2016).

In explaining the definition of disability under the ADA, the EEOC's regulations state that the "substantially limits" standard is not meant to be a "demanding" one. 29 C.F.R. § 1630.2(j)(1)(i). The regulations accordingly provide that some types of physical and mental impairments "will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity" and that the assessment of such impairments "should be particularly simple and straightforward." Id. at § 1630.2(j)(3)(ii). For example, "it should easily be concluded" that certain mental impairments, including "major depressive disorder" and "post-traumatic stress disorder" will "substantially limit brain function." Id. at § 1630.2(j)(3)(iii); see also Mastaw v. W. Fla. Med. Ctr. Clinic, PA, No. 22-12202, 2023 WL 5426757, at *3 (11th Cir. Aug. 23, 2023) (per curiam) (citing 29 C.F.R. § 1630.2(j)(3)(iii) to conclude that "[p]ost-traumatic stress disorder is a disability under the ADA").

In the Amended Complaint, Plaintiff alleges that she suffered from "anxiety, depression, and similar mental health conditions." (Doc. 12, p. 8.) In Plaintiff's April 2024 request for reasonable accommodation, Plaintiff's counselor asserted that Plaintiff was receiving treatment for PTSD and experiencing extreme anxiety at work. (Doc. 22-11, p. 3.) Defendant argues that Plaintiff does not have a disability because Plaintiff has not shown that her PTSD and anxiety affected any of her major life activities, Plaintiff testified her major depressive disorder did not interfere with her ability to perform her job duties, and Plaintiff did not report her disability to Defendant before her reasonable accommodation request. (Doc. 22, p. 15 (citing doc. 22-1, p. 19).)

Plaintiff testified that she suffered from PTSD while employed with Defendant and that her mental health diagnoses made it difficult for her to interact with her coworkers. (Doc. 22-1, pp. 9, 63.) In February 2024, Plaintiff emailed Outlaw stating that her work environment had

caused "increased emotions, stress, and anxiety, which has [led] to increased VA appointments and VA medication amongst other things." (Doc. 27-1, p. 1.) Plaintiff also provided Outlaw with medical records documenting Plaintiff's struggles with work related stressors that impacted her mental health, increased her anxiety and panic attacks at work, and made it difficult for her to function. (Doc. 27-2.) In March 2024, Plaintiff emailed Outlaw and Pollett, informing them that the sexual harassment she experienced at work had been triggering her mental health diagnoses, and the trauma she experienced interfered with her productivity at work and increased her anxiety and panic attacks. (Doc. 27-5, p. 1.) In May 2024, Plaintiff emailed Outlaw and Pollett stating that her supervisor's comments "continue to trigger [her] PTSD and [have] caused [her] anxiety to spike [to] where [she] now [has] had multiple panic attacks," making it "difficult" for her to complete her testing responsibilities. (Doc. 27-6, p. 1.) Defendant does not dispute this evidence. The evidence Plaintiff has provided provides a basis for a jury to find, at minimum, that she had a mental impairment of PTSD and such impairment substantially limited her brain function as compared to most people in the general population. <u>See</u> 29 C.F.R. 1630.2(j)(3)(iii) ("[I]t should easily be concluded" that "major depressive disorder" and "post-traumatic stress disorder" will substantially limit "brain function."); <u>ZOe Ctr.</u>, 2025 WL 1788973, at *8. Plaintiff has thus pointed to sufficient evidence to support a finding that she had a "disability" within the meaning of the ADA.

**(2) Whether Plaintiff was Denied a Reasonable Accommodation**

Defendant argues that even if Plaintiff could show that she had a disability, the evidence shows that she was not denied a reasonable accommodation. (Doc. 22, p. 16–17.) "The plaintiff bears the burden of identifying a reasonable accommodation, and an employer is not required to accommodate an employee in any manner in which the employee desires." <u>Knowles v. Sheriff,</u>

460 Fed. App'x 833, 835 (11th Cir. 2012) (citing Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285–86 (11th Cir.1997)). Only after the plaintiff has requested a reasonable accommodation and the employer failed to provide the accommodation can the plaintiff prevail on a discrimination claim. Id. at 835–36.

In addition to requiring the plaintiff to show that her employer failed to reasonably accommodate her disability, leading to an adverse employment decision—the plaintiff must show that this discrimination occurred "because of her disability"—that is, that the adverse employment decision was caused by her disability. Holly, 492 F.3d at 1263 n.17. In this case, for instance, Plaintiff bears the burden of showing not only that Defendant failed to reasonably accommodate her disability, but that, but for Defendant's failure to accommodate her disability, she "would not have been terminated." Id.

In her April 11, 2024, request for reasonable accommodation, Plaintiff stated she needed "[c]ommunication assistance" with her manager, Hall. (Doc. 22-11, p. 2.) In her request, Plaintiff's counselor asserted that Plaintiff "was receiving treatment for PTSD and experiencing extreme anxiety at work," and that Plaintiff "would benefit from receiving communication from her supervisor in email form with specific expectations." (Id. at p. 3.) Plaintiff's counselor explained that Plaintiff "should be able to summarize the communication in an email back to ensure accuracy of understanding," and that such communication "should continue for the duration of the PIP." (Id.)

Plaintiff argues that Defendant "failed to meaningfully act upon" her reasonable accommodation request and claims that "Defendant did not explicitly inform [her] whether [Defendant] granted her accommodation or not." (Doc. 27, p. 19.) Email correspondence between Gulfstream employees on May 3, and May 8, 2024, indicate that Plaintiff's request that *all*

communication from her manager be in writing was deemed unreasonable and Outlaw indicated that she had "set up a meeting with [legal]" to review Plaintiff's request. (Doc. 27-16.) Human resources explained to Plaintiff that communication with Hall could not be *exclusively* through email as her immediate supervisor had to be able to communicate with her verbally at times, including at her bimonthly PIP meetings. (Doc. 28, p. 40.) At her deposition, Plaintiff agreed that following her request for a reasonable accommodation (as well as before her request), she was allowed to send summary recap emails to Hall and Hall typically responded to these emails with comments. (Id. at p. 41; doc. 22-1, p. 45.) But Plaintiff testified that she felt that Hall's email responses should have included "more direction" and that they "should have been a little bit more professionally done." (Doc. 28, p. 41; doc. 22-1, p. 45.)

While it is unclear whether Defendant explicitly granted Plaintiff's accommodation request, Plaintiff has not provided any evidence that Defendant failed to provide her reasonable accommodation prior to her termination. Plaintiff has also failed to show that Defendant's alleged failure to provide her requested accommodation amounted to her termination "because of her disability." See Holly, 492 F.3d at 1263 n. 17. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's reasonable accommodation ADA discrimination claim within Count I.

**B. Disparate Treatment**

Courts examine ADA disparate-treatment claims under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Anderson v. Embarq/Sprint, 379 Fed. App'x 924, 927 (11th Cir. 2010). At the first step, the employee may "establish a *prima facie* case of disability discrimination using circumstantial evidence." Akridge v. Alfa Ins. Cos., 93 F.4th 1181, 1191 (11th Cir. 2024) (citing Todd v. Fayette Cnty. Sch. Dist., 998 F.3d 1203, 1215

(11th Cir. 2021)). To establish a *prima facie* case of discrimination under the ADA, Plaintiff must show that she (1) has a disability; (2) is a qualified individual under the ADA; and (3) suffered an adverse employment action "on the basis of" her disability. See Beasley v. O'Reilly Auto Parts, 69 F.4th 744, 754 (11th Cir. 2023). Second, "[i]f the employee is successful in making a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision." Akridge, 93 F.4th at 1191 (citing Todd, 998 F.3d at 1216). Third, if the employer provides a legitimate reason, "[t]he burden then shifts back to the employee to present sufficient evidence creating a genuine issue of material fact that the employer's reason is pretext for discrimination." Id. But "summary judgment should not be granted for failure to demonstrate pretext unless it also 'reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination.'" Ismael v. Roundtree, 161 F.4th 752, 763 (11th Cir. 2025) (quoting Tynes v. Fla. Dep't Juv. Just., 88 F.4th 939, 953 (11th Cir. 2023). The Eleventh Circuit Court of Appeals has held

> (1) that a "plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent" and (2) that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."

Id. at 760 (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)). Here, Plaintiff argues that she has presented enough circumstantial evidence of discrimination for her claim to survive summary judgment under either McDonnell Douglas or the "convincing mosaic" framework. (Doc. 27, pp. 3–5, 13–21.)

Courts in the Eleventh Circuit "may assume without deciding that the plaintiff has established a *prima facie* case" when "the defendant has met its burden of articulating a legitimate, non-discriminatory reason for its action." Kent v. Garden City, No. 4:23-cv-307, 2025 WL

588999, at *8 (quoting Thomas v. Dolgencorp, LLC, 645 F. App'x 948, 951 (11th Cir. 2016)). This approach is appropriate here. Assuming without deciding that Plaintiff has established a *prima facie* case, her ADA discrimination claim still fails under McDonnell Douglas because Defendant has articulated legitimate reasons for terminating Plaintiff, and Plaintiff has not presented sufficient evidence that these reasons are pretext for discrimination.[1]

**(1) Defendants' Legitimate, Non-discriminatory Reason for Terminating Plaintiff and Pretext**

Assuming that Plaintiff established a *prima facie* ADA case, the burden shifts to Defendant to "articulate a legitimate, non-discriminatory reason for its decision" to place her on a PIP and subsequently terminate her. Akridge, 93 F.4th at 1191 (citing Todd, 998 F.3d at 1216). Employers

---

[1] Plaintiff argues that both her termination and her placement on a PIP are adverse employment actions for purposes of her retaliation and discrimination claims. (Doc. 27, p. 5–7.) Defendant concedes that Plaintiff's termination was an adverse employment action but argues that her placement on a PIP was not an adverse employment action. (Doc. 32, pp. 5–7.) In the Eleventh Circuit, "placement on a PIP may constitute an adverse employment action, but not always." Joachim v. Premia Mortgage LLC, 1:21-CV-1568-MHC-CMS, 2022 WL 2570675, at *10 (N.D. Ga. July 6, 2022). "The key is whether the PIP's terms result in a change to the employee's compensation or position; if the PIP simply requires the employee to improve her performance and comply with already-established expectations and duties, placement on a PIP does not rise to the level of an adverse employment action." Id. Here, Plaintiff argues that her reporting requirements significantly increased, and she was required to attend biweekly meetings. (Doc. 27, p. 6.) Plaintiff also argues that if "placement on a PIP results in a more tangible adverse action, such as termination, it can constitute an adverse employment action." (Doc. 27, p. 7 (citing Murdick v. Catalina Mktg. Corp., 496 F. Supp. 2d 1337, 1357 (M.D. Fla. 2007)). Yet, like the plaintiff in Joachim, Plaintiff fails to provide the Court with sufficient information regarding her claimed increased supervision and work assignments to create a genuine dispute as to whether the PIP "meets the threshold level of substantiality" required for the PIP to constitute an adverse employment action. See 2022 WL 2570675, at *10 (quoting Moore v. Hillsborough Cnty. Bd. of Cnty. Comm'rs, 544 F. Supp. 2d 1291, 1308 (M.D. Fla. 2008)); see also Arnold v. United Airlines, Inc., 142 F.4th 460, 471 (7th Cir. 2025) ("Here, . . . considering the facts in the light most favorable to Ms. Arnold, she can maintain only that she was placed on a PIP and that the reorganization brought about some changes in her daily responsibilities. She remained a member of the same team and continued to work in the communications department of United's operation. Her compensation, benefits, vacation times, and working hours were not affected. Nor did she provide any evidence that her assignments while on the PIP were impossible for her to complete. She was given some additional assignments, and some of her assignments changed. But these changes were all within the normal scope of her employment and thus did not adversely affect the terms and conditions of her employment."); Johnson v. Gwinnett Cnty. Sch. Dist., 1:11-CV-00471-TWT, 2012 WL 5987584, at *10 (N.D. Ga. Oct. 17, 2012), report and recommendation approved, 2012 WL 5987581 (N.D. Ga. Nov. 28, 2012) (collecting cases). Accordingly, Defendant's issuance of a PIP to Plaintiff cannot be deemed an "adverse action," and the Court will only analyze Plaintiff's discrimination and retaliation claims as to Plaintiff's termination.

can satisfy this burden by offering enough evidence to raise a genuine dispute of fact that they terminated the employee for reasons other than the employee's perceived status as disabled. See Kragor v. Takeda Pharms. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012); Walker v. Mortham, 158 F.3d 1177, 1184 (11th Cir. 1998) (quoting Tex. Dep't. Cmty. Affs. v. Burdine, 450 U.S. 248, 255 (1981)). The Eleventh Circuit has described this burden as "exceedingly light." Duckworth v. Pilgrim's Pride Corp., 764 F. App'x. 850, 853 (11th Cir. 2019) (quoting Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983)). Indeed, employers can identify any rationale for a challenged termination that "might motivate a reasonable employer." Id. (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030–31 (11th Cir. 2000)). Moreover, the employer "need not persuade the court that it was actually motivated by the proffered reasons." Id. (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004)). Rather, to meet its "legitimate reason" burden, the employer need only "produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. (quoting Burdine, 450 U.S. 257). The Court finds Defendant has met this burden here.

The record contains evidence suggesting Defendant had legitimate, non-discriminatory reasons to place Plaintiff to fire Plaintiff after placing her on a PIP. Defendant issued Plaintiff her PIP in February 2024, which stated that, "[d]uring the past 12 months it has been increasingly evident that [Plaintiff has] not been performing [her] assigned work in accordance with what is expected of a Completions Tech Spec I." (Doc. 22-2, p. 69.) The PIP outlined specific areas of concern and expectations for performance improvement over a 90-day period. (Id. at pp. 69–70.)

Defendant terminated Plaintiff on June 10, 2024. (Doc. 28, p. 54.) It is standard practice at Gulfstream that if an employee is placed on a PIP and their performance does not improve during

the PIP, Defendant will terminate the employee. (Doc. 22-19, p. 5; doc. 22-20, p. 5; doc. 22-21, p. 5; doc. 22-24, p. 2.) On June 6, 2024, Outlaw emailed her supervisor, Stacie Coppock regarding Plaintiff's PIP progress. (Doc. 27-19.) Outlaw stated that "[t]he business feels that [Plaintiff] has failed at being successful with her PIP and do[es] not feel that she has the ability to be in a role that has time constraints due to AC delivery." (Id. at p. 1.) Outlaw explained that "[t]he business feels that [Plaintiff] has not been able to successfully" meet the PIP's 90-day expectations. (Id. at p. 2.) Outlaw, Pollett, and Hall stated in their Declarations that they believed Plaintiff's performance did not improve during the PIP, and O'Hara stated that he "fully supported" the decision to terminate Plaintiff because she had not met the substantive goals of the PIP. (Doc. 22-19, pp. 5–6; doc. 22-20, p. 5; doc. 22-21, p. 5; doc. 22-24, p. 3.) Plaintiff admits the fact that her performance did not improve during the PIP period, that she was not able to perform the core function of her role, or that it was clear that she had not achieved the basic goals of the PIP when the 90-day period expired "to the extent that Defendant allegedly believed" such facts. (See doc. 28, p. 51–53.) This evidence indicates that Defendant terminated Plaintiff because it believed she did not successfully meet the PIP expectations and she did not improve performance during the 90-day PIP period—not because of discriminatory animus. (See doc. 27-19; doc. 22-19, pp. 5–6; doc. 22-20, p. 5; doc. 22-21, p. 5; doc. 22-24, p. 3.) This satisfies Defendants' "light" burden of identifying a legitimate, non-discriminatory reason for terminating Plaintiff. Duckworth, 764 F. App'x. at 853.

Because Defendant has presented legitimate, non-discriminatory reasons for terminating Plaintiff, Plaintiff must show that those reasons were "mere pretext for discrimination based on her disability." Todd, 998 F.3d at 1217–18 (citing Alvarez v. Royal Atl. Devs. Inc., 610 F.3d 1253, 1265 (11th Cir. 2010)). To show pretext, employees must create a factual dispute regarding

"*both* [whether] the reason was false, *and* [whether] discrimination was the real reason." Akridge, 93 F.4th at 1196 (quoting Ring v. Boca Ciega Yacht Club Inc., 4 F.4th 1149, 1163 (11th Cir. 2021)).

First, employees can show a proffered reason is false by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason for the employment action that a reasonable factfinder could find them unworthy of credence." Thomas, 645 F. App'x at 951 (citing Springer v. Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344, 1348 (11th Cir. 2007)). Because the employer's motivation is the sole concern at this stage, the falsity inquiry "centers on the employer's beliefs," and not the "truth" of those beliefs in "reality as it exists outside of the [employer's] head." Todd, 998 F.3d at 1218; see also id. ("[A]t the pretext stage of the inquiry, we are unconcerned with the truth of the allegations that led to [the plaintiff]'s termination."); Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1329 (11th Cir. 2020) (employer may fire employee based on erroneous facts). To show falsity, employees therefore must identify sufficient evidence to suggest their employer "did not honestly believe" their claimed reasons for the termination. Todd, 998 F.3d at 1218.

Second, the employee must show that "discrimination was the real reason" for their termination. Akridge, 93 F.4th at 1196. "A finding that [an employer's] proffered reason is false does not compel an inference of discrimination." Thomas, 645 F. App'x at 951. Rather, "because the burden of proving discriminatory intent remains at all times with the plaintiff," the plaintiff-employee must point to at least some evidence suggesting their employer acted with discriminatory animus to establish pretext. Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).

With respect to her ADA discrimination claim, Plaintiff does not attempt to demonstrate that Defendant's stated reasons for terminating her are false. (See doc. 27, pp. 13–19.) Plaintiff

only attempts to demonstrate that Defendant's reasons for placing her on a PIP were false. (Id.) As the Court has noted, Plaintiff's PIP is not an adverse employment action for the purposes of an ADA discrimination claim. Accordingly, the Court agrees with Defendant and finds Plaintiff has failed to create a factual dispute that the proffered reasons for terminating her were false, or that the real reason was disability discrimination.

Even if there were a dispute as to whether Defendant's stated reasons were false, Plaintiff has not identified any evidence suggesting that the *real* reason Defendant terminated her was to discriminate against her based on her perceived disability. (See doc. 27, pp. 13–19.) Because Plaintiff has thereby failed to show either that Defendants' proffered reasons for terminating Plaintiff are false or that the real reason was discriminatory, Plaintiff has failed to meet her burden of establishing pretext. See Akridge, 93 F.4th at 1196.

**(2) No Convincing Mosaic of Circumstantial Evidence Supporting Plaintiff's ADA Discrimination Claim**

Even though Plaintiff's ADA claim fails the McDonnell Douglas framework, the claim can still survive summary judgment if Plaintiff presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." Akridge, 93 F.4th at 1197 (quoting Lewis, 934 F.3d at 1185). Eleventh Circuit precedent makes clear that "a plaintiff who cannot establish the McDonnell Douglas *prima facie* case is entitled to a full review under the convincing mosaic standard." Ismael, 161 F.4th at 761. Employees may create this "convincing mosaic" by pointing to, among other things, "(1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn'; (2) systemically better treatment of similarly situated employees; and (3) evidence that the employer's justification is pretextual." Id. at 760 (quoting Lewis, 934 F.3d at 1185). By "jumping directly to the . . . question of liability," this alternative standard helps ensure proper summary judgment

outcomes despite certain "limits" to the McDonnell Douglas framework. Tynes, 88 F.4th at 946–47. Both standards, however, address the same "ultimate inquiry in a discrimination lawsuit"—whether there is "enough evidence for a reasonable factfinder to infer intentional discrimination." Id. (citing Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022)).

Plaintiff argues that, "[b]ased on the totality of the circumstantial evidence, including the lack of performance or disciplinary issues, the repeated disclosures of her disabilities to Defendant, and the reasonable accommodation request in which Defendant failed to meaningfully act upon, [she] has demonstrated a 'convincing mosaic' of discrimination as well." (Doc. 27, p. 19 (citing Tynes, 88 F.4th at 946).) Specifically, Plaintiff argues that the facts that Defendant had actual knowledge of her disability prior to her termination and that Defendant did not explicitly inform her whether it granted her accommodation "reveal that discrimination is 'the most likely alternative explanation' here." (Doc. 27, p. 19 (quoting Cleveland v. Home Shopping Network, Inc, 369 F.3d 1189, 1195 (11th Cir. 2004)).) Yet this evidence alone does not support an inference of intentional discrimination. As to her ADA claim, Plaintiff has failed to provide evidence of suspicious timing, ambiguous statements, systemically better treatment of similarly situated employees, or evidence that the employer's justification is pretextual. See Ismael, 161 F.4th at 760.

Plaintiff has thus failed to present a "convincing mosaic" of circumstantial evidence that supports her ADA discrimination claim and that could allow a reasonable jury to infer disability discrimination. Because Plaintiff's ADA Discrimination claim accordingly cannot survive summary judgment under either applicable theory, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's disparate treatment ADA claim. (Count I.)

## II. Gender Discrimination under Title VII (Count V)

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To prove a claim under Title VII, a plaintiff can use direct evidence, circumstantial evidence, or both. See Jenkins v. Nell, 26 F.4th at 1249. In the Eleventh Circuit, sex or gender discrimination claims based on circumstantial evidence, such as Plaintiff's claim here, are analyzed under the McDonnell Douglas burden-shifting framework. King v. Ferguson Enterprises, Inc., 971 F. Supp. 2d 1200, 1210 (N.D. Ga. 2013), aff'd, 568 Fed. App'x 686 (11th Cir. 2014) (citing Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir.1994)). Here, Plaintiff argues that she has presented enough circumstantial evidence of discrimination for her Title VII claim to survive summary judgment under either McDonnell Douglas or the "convincing mosaic" framework. (Doc. 27, pp. 7–13.) The Court addresses each argument in turn and, finding the claim fails under both standards, **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's Title VII discrimination claim (Count V).

### A. *Prima Facie* Case

To establish a *prima facie* case of discrimination under Title VII, Plaintiff must show that "(1) she belongs to a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified to perform the job in question, and (4) her employer treated similarly situated employees outside her class more favorably." Tynes, 88 F.4th at 944 (internal quotations and citations omitted). The last requirement is met when the plaintiff presents "evidence of a comparator—someone who is similarly situated in all material respects." Id. (quoting Jenkins, 26 F.4th at 1249). However, "the plaintiff's failure to produce a comparator does not necessarily

doom the plaintiff's case. Indeed, the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id. at 945 (quoting Smith, 644 F.3d at 1328).

Defendant argues that Plaintiff's gender discrimination claim under Title VII fails because she cannot establish a *prima facie* case. (Doc. 22, pp. 23–24.) Defendant concedes that Plaintiff is a member of a protected class and was subjected to an adverse employment action (termination) but Defendant claims that Plaintiff has not "identified a single comparator in support of this cause of action." (Doc. 22, p. 24.) Specifically, Defendant argues that Plaintiff has not alleged or shown that similarly situated male employees were treated more favorably. (Id.) In her Response, Plaintiff identifies her coworker, Romagnino, as a similarly situated comparator outside her protected class whom Defendant treated more favorably than Plaintiff. (Doc. 27, pp. 8–10.)

To give rise to an inference of discrimination, "a comparator must be 'similarly situated in all material respects,' meaning that the plaintiff and comparators are 'sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.'" Earle v. Birmingham Bd. of Educ., 843 F. App'x 164, 166 (11th Cir. 2021) (quoting Lewis, 918 F.3d at 1218, 1228). A similarly situated comparator "will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history." Id. "A plaintiff's failure to produce evidence showing that a single similarly situated employee was treated more favorably will preclude the establishment of a prima facie case." Id.

Plaintiff argues that Romagnino is a similarly situated comparator because (1) they had the same job title while working for Defendant; (2) they performed quality assurance work for

Defendant for the same period of time; (3) they both had a quality assurance certification; and (4) they shared the same supervisor. (Doc. 27, pp. 8–9.) Plaintiff argues that "Defendant treated Romagnino more favorably during his tenure as Defendant placed [Plaintiff], not Romagnino, on a PIP in February 2024, even though [Romagnino] 'engaged in the same basic conduct as the plaintiff' when it pertained to work performance." (Id. at p. 9.) As Defendant notes, Plaintiff presents Romagnino as a comparator in the context of Plaintiff's placement on a PIP, not her termination. (See doc. 27, pp. 7–13.) Romagnino was not placed on a PIP, and he was terminated in March 2024, following Plaintiff's sexual harassment complaint against him. (Doc. 28, pp. 22–23.) Plaintiff argues that Defendant made ambiguous statements as to whether Romagnino would have been placed on a PIP if he remained at Gulfstream. (Doc. 27, pp. 9–10.)

While Romagnino's suitability as a similarly situated comparator seems dubious under the given facts (specifically, because he was not placed on a PIP and Plaintiff has not shown why he should have been placed on one), even assuming he qualifies for the purpose of Plaintiff's Title VII claim, Plaintiff's claim still fails. Assuming Plaintiff could establish a *prima facie* case of gender discrimination under Title VII, Plaintiff has not established that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff is pretext.

**B. Defendants' Legitimate, Non-discriminatory Reason for Terminating Plaintiff and Pretext**

The Court has determined that Plaintiff's failure to successfully meet the PIP expectations is a legitimate, non-discriminatory reason for terminating Plaintiff. See Discussion Section I.B(1), supra. Plaintiff has not identified evidence that supports an inference of discrimination because of her gender. Plaintiff bases the entirety of her argument about pretext on a meeting she had with her then-supervisor, Caughran, on February 8, 2024. (Doc. 27 p. 11.) Plaintiff alleges that, in this meeting, she first learned about the possibility of being placed on a PIP, and Caughran told her

that he did not have issues with her job performance, only that Plaintiff's interactions with individuals "needed polishing." (Id.) Plaintiff claims that in that meeting, Caughran told her that she "needed to also work on [her] emotions/crying." (Id.) However, this evidence does not create an inference of discrimination based on gender and Plaintiff has thus failed to establish pretext.

### C. No Convincing Mosaic of Circumstantial Evidence Supporting Plaintiff's Title VII Discrimination Claim

Even though Plaintiff's Title VII gender discrimination claim fails the McDonnell Douglas framework, the claim can still survive summary judgment if Plaintiff "presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Ismael, 161 F.4th at 760. To be sure, "the strength of [Plaintiff's] comparator evidence is relevant to the ultimate question of intentional discrimination. But to the extent that there are material differences between [Plaintiff and Romagnino] at this stage of the case, it is the jury's role—not [the Court's]—to determine how much weight the comparator evidence should be given." Tynes, 88 F.4th at 947(internal citations omitted). "In other words, it is possible that her comparator[] w[as] insufficient to establish a *prima facie* case yet still relevant to the ultimate question of intentional discrimination." Id. Indeed, "failure to produce a comparator does not necessarily doom the plaintiff's case. Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Smith, 644 F.3d at1328.

Plaintiff argues that, "[b]ased on the totality of the circumstantial evidence, including the lack of performance or disciplinary issues and the discriminatory comments . . ., as well as the issues with Defendant's investigation into the similarly situated comparator's sexual harassment of [Plaintiff], she has demonstrated a 'convincing mosaic' of discrimination. (Doc. 27, p. 13 (citing Tynes, 88 F.4th at 946).) As to her "convincing mosaic" argument, Plaintiff predominantly takes

issue with Defendant's investigation into Romagnino's sexual harassment. (Doc. 27, pp. 12–13.) However, as the Court explains in Discussion Section VI, infra, "where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow." Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1288 (11th Cir. 2003).

Plaintiff has thus failed to present a "convincing mosaic" of circumstantial evidence that supports her Title VII discrimination claim and which would allow a reasonable jury to infer gender discrimination. Because Plaintiff's Title VII Discrimination claim accordingly cannot survive summary judgment under either applicable theory, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's Title VII gender discrimination claim (Count V).

### III. Retaliation Claims (Counts II, IV & VI)

In addition to her ADA discrimination claim, Plaintiff asserts three causes of action for retaliation: one under the ADA (Count II); one under FMLA (Count IV); and one under Title VII (Count VI). (Doc. 12, pp. 14–18, 20–22, 23–24.) The ADA, FMLA, and Title VII prohibit employers from retaliating against employees for exercising rights guaranteed under those statutes. See Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999) (ADA retaliation); Smith v. City of Fort Pierce, 565 F. App'x 774, 776–77 (11th Cir. 2014) (Title VII Retaliation); Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 797–98 (11th Cir. 2000) (FMLA Retaliation). Plaintiff alleges in Count II that Defendant violated the ADA by retaliating against her for submitting a reasonable accommodation request. (Doc. 12, pp. 14–18.) In Count IV, Plaintiff alleges that Defendant violated the FMLA by retaliating against her for requesting statutorily protected medical leave. (Id. at pp. 20–22.) In Count VI, Plaintiff alleges that

Defendant violated Title VII by retaliating against her for her complaints about gender discrimination.[2] (Id. at pp. 23–24.)

Because Plaintiff supports her retaliation claims with only circumstantial evidence,[3] the Court again applies the McDonnell Douglas burden-shifting framework. Ismael, 161 F.4th at759 ("Employment . . . retaliation cases . . . are shaped by the famous yet ill-understood Supreme Court holding in McDonnell Douglas[.]"). To meet the framework's initial burden of establishing a *prima facie* case of retaliation, an employee must show that "(1) [s]he engaged in a 'statutorily protected activity'; (2) [s]he suffered an adverse employment action; and (3) there is some causal relation between the two events." McAlpin v. Sneads, 61 F.4th 916,, 61 F.4th 916, 931 (11th Cir. 2023) (citing Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1243 (11th Cir. 2010)) (referring to FMLA retaliation); see also Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) (same standard for Title VII retaliation); Farley, 197 F.3d at 1336 (same standard for ADA retaliation).

If the employee establishes a *prima facie* case, the burden of production shifts in essentially the same manner as in the ADA context. The employer must "proffer a legitimate, non-retaliatory

2 Plaintiff does not dispute Defendant's argument that Plaintiff cannot provide the necessary support for her Title VII retaliation claim. (See doc. 27.) Accordingly, the Court **GRANTS** Defendant's Motion as to Count VI. See Hardy v. Ga. Dep't of Corr., No. 1:17-cv-172, 2019 WL 4670758, at *10 (S.D. Ga. Sept. 24, 2019); Burnette v. Northside Hosp., 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."); Zarate v. U.S. Att'y Gen., 307 F. App'x 289, 290 (11th Cir. 2009) ("A party . . . waives an issue by failing to make any substantive arguments with respect to that issue.").

3 Plaintiff concedes in her Response that "the McDonnell Douglas burden-shifting framework applies to [her] claims of discrimination and retaliation pursuant to Title VII and the ADA, as well as her FMLA retaliation claim." (Doc. 27, p. 3; see also id. at p. 20 ("Since [Plaintiff] utilizes circumstantial evidence to prove her ADA retaliation claim, she is required to establish a *prima facie* case under the McDonnel Douglas framework[.]"); id. at p. 23 ("Where, as here, a plaintiff relies on circumstantial evidence to establish the defendant's retaliatory intent [under her FMLA retaliation claim], the Eleventh Circuit applies the McDonnell Douglas burden-shifting framework.").)

reason for the adverse employment action." McAlpin, 61 F.4th at 932 (quoting Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)). If the employer does so, "[t]he burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the 'legitimate' reason is merely pretext for prohibited, retaliatory conduct." Id. at 927 (quoting Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000)).

However, the Eleventh Circuit has held that "summary judgment should not be granted for failure to demonstrate pretext unless it also 'reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination' or retaliation." Ismael, 161 F.4th at 763 (quoting Tynes, 88 F.4th at 947). The Eleventh Circuit has applied the "convincing mosaic standard" "in equal measure to claims of discrimination and retaliation." Id. at 760 (citing Berry v. Crestwood Healthcare, 84 F.4th 1300, 1310 (11th Cir. 2023) ("An employee may rely on a convincing mosaic of circumstantial evidence to prove retaliation.")).

### A. *Prima Facie* Retaliation Case

To meet the framework's initial burden of establishing a *prima facie* case of ADA and FMLA retaliation, an employee must show that: "(1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal link between the adverse action and the protected activity." Ivey v. Savannah-Chatham Pub. Sch., No. 4:20-cv-16, 2021 WL 3549901, at *16 (S.D. Ga. Aug. 11, 2021). Defendant does not dispute that Plaintiff has established a *prima facie* case for FMLA retaliation but argues that Plaintiff cannot establish a *prima facie* case of ADA retaliation "because she has offered no evidence of a causal link between Plaintiff's termination in June 2024 and her request for a reasonable accommodation in April [2024]." (Doc. 22, pp. 21, 23.) The causal showing a plaintiff must make for a *prima facie* case is less demanding than the separate "but for" standard that will apply at the "pretext"

step. Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1294 (11th Cir. 2021); see also Criag v. City of Mobile, No. 1:23-cv-00269-KD-M, 2024 WL 4905630, *20 (S.D. Ala. Nov. 27, 2024). To prove a causal connection, a plaintiff need only demonstrate "that the protected activity and the adverse action were not *wholly unrelated*." Farley, 197 F.3d at 1337 (quoting Clover v. Total Sys. Services, 176 F.3d 1346, 1354 (11th Cir.1999)). The Eleventh Circuit has "plainly held that a plaintiff satisfies this element if [s]he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." Id.

Here, there is no dispute that Outlaw knew of Plaintiff's request for reasonable accommodation at the time of Plaintiff's termination. Plaintiff formally requested a reasonable accommodation on April 11, 2024, and her request was emailed to Outlaw on April 30, 2024. (Doc. 28, p. 36; doc. 22-11.) Further email correspondence between Gulfstream human resources personnel on May 8, 2024, show that both Outlaw and Pollett were aware of and considering Plaintiff's request for reasonable accommodation. (Doc. 27-16.) Defendant's termination of Plaintiff on June 10, 2024, thus occurred roughly two months after Plaintiff's protected activity.

While it is not entirely clear that this temporal proximity is close enough to satisfy the "not wholly unrelated" requirement, cf. Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[A] three and one-half-month proximity between a protected conduct and an adverse employment action is insufficient to create a jury issue on causation."), the Court will assume without deciding that Plaintiff's ADA retaliation claim satisfies the final requirement for a *prima facie* case. The Court finds, at any rate, that the claim fails under the subsequent steps of McDonnell Douglas.

**B. Defendants' Legitimate, Non-retaliatory Reasons for Terminating Plaintiff and Pretext**

Because Plaintiff has established a *prima facie* case for both ADA and FMLA retaliation, the burden shifts to Defendant to articulate a legitimate, non-retaliatory reason for their termination of Plaintiff. Ismael, 161 F.4th at 759. To meet this burden of production, Defendant again asserts that it terminated Plaintiff because it concluded she failed to successfully complete her 90-day PIP. (Doc. 22, pp. 21, 23.) For the same reasons explained above in the context of Plaintiff's discrimination claims, this explanation satisfies Defendant's light burden. See Todd, 998 F.3d at 1219 (single explanation for adverse employment action satisfied employer's "legitimate reason" burden as to both discrimination and retaliation claims). The burden accordingly shifts back to Plaintiff, who must create a genuine dispute of fact that Defendant's proffered reasons are pretext for retaliation. McAlpin, 61 F.4th at 927.

The Court finds Plaintiff has failed to show pretext because, considering Defendant's legitimate reasons, there is insufficient evidence that ADA or FMLA retaliation was a "but-for" cause of Plaintiff's termination. As in discrimination cases, to establish at summary judgment that an employer's proffered reason is pretext for illegal retaliation, a plaintiff must show "*both* that the reason was false, *and* that retaliation was the real reason." Gogel v. Kia Motors Mfg. Ga., Inc., 967 F.3d 1121, 1136 (11th Cir. 2020) (quoting Springer, 509 F.3d at1349) (alterations adopted). Even though "[a plaintiff's] temporal-proximity arguments may be enough to establish a *prima facie* case of retaliation, temporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual." Todd, 998 F.3d at 1219–10 (citing Id. at 1137 n.15). The Eleventh Circuit has instead established that, "[a]t the stage of summary judgment proceedings in which the plaintiff must rebut the defendant's proffered nonretaliatory reason for its action, . . . the plaintiff must meet the more demanding 'but for' test." Tolar, 997 F.3d at 1294; see also Gogel,

967 F.3d at 1135 n.13 ("We and other circuit courts have integrated this but-for standard into our summary judgment analysis."). This requires an employee to show that, despite her employer's proffered reason, "one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action." Tolar, 997 F.3d at 1294. Here, Plaintiff has not made this showing.

The Court already explained above that Plaintiff has failed to show Defendant's proffered reasons for terminating her—that she failed to meet the expectations of her PIP—are "false." This finding remains true in the retaliation context. Furthermore, Plaintiff has not shown that, "but for" her protected conduct, she would not have been terminated. The but-for causation test "directs us to change one thing at a time and see if the outcome changes." Lapham v. Walgreen Co., 88 F.4th 879, 894 (11th Cir. 2023) (quoting Bostock v. Clayton Cnty., 590 U.S. 644, 656 (2020)). If the outcome changes, "the isolated factor is a but-for cause. And if it does not, the isolated factor is not a but-for cause." Id. (citing Bostock, 590 U.S. at 656). The Court finds that Plaintiff's retaliatory pretext argument fails this test. Changing the facts that Plaintiff requested a reasonable accommodation and FMLA leave would not change her ultimate termination. That is, even if Plaintiff had not engaged in that conduct, Defendant still would have terminated her based on its belief that she did not successfully complete her PIP. Because Plaintiff has therefore failed to show Defendant's proffered reasons for terminating her are pretext for retaliation, the Court turns to whether Plaintiff has presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Ismael, 161 F.4th at 760.

### C. No Convincing Mosaic of Circumstantial Evidence Supporting Plaintiff's Retaliation Claims

As to both her ADA and FMLA retaliation claims, Plaintiff only asserts that she "sufficiently establishes the necessary causal link, and, in turn, satisfies her *prima facie* burden of

retaliation." (Doc. 27, pp. 21, 25.) Plaintiff argues that, as a result, "the remainder of the McDonnell Douglas burden-shifting framework now applies," and that she "thoroughly addresses these matters throughout her Response herein." (Id.)

As to Plaintiff's ADA retaliation claim, Defendant argues that "the events that led to [Plaintiff's] performance-based termination were in motion well before she requested an accommodation" because her PIP, which led to her performance-based termination, began in February. (Doc. 22, p. 21; doc. 32, p. 11.) Plaintiff counters that a significant portion of her PIP related to testing activities and the first documentation of Plaintiff's negative testing performance appears to have been made on May 9, 2024, one day after Sedgwick notified Hall about Plaintiff's FMLA leave request. (Doc. 28, pp. 48–49; doc. 27-18.) Yet, as Defendant notes, the PIP itself states that Plaintiff is "unable to demonstrate the ability to learn how to accomplish testing and troubleshooting in the ITFs. Also, you have not taken the initiative to run the test plans and ask questions when needed, instead you wait to be told what to do step by step." (Doc. 22-2 at 69.) Plaintiff does not make clear how this argument, given the undisputed facts, supports a finding that Defendant terminated her because she requested a reasonable accommodation or FMLA leave.

As to her FMLA retaliation claim, Plaintiff argues that she "wanted to begin FMLA leave on May 27, 2024, but the record evidence shows that she only delayed her start date to June 17, 2024, because Outlaw instructed [Plaintiff] to discuss her leave dates with Hall first." (Doc. 27, p. 24.) But Outlaw explicitly told Plaintiff that, "[a]s for the [FMLA leave] start date, it can be adjusted to accommodate you and your needs, Sedgwick just needs the information." (Doc. 27-17, p. 1.) Plaintiff also relies on the June 6, 2024, email where Outlaw updated Gulfstream employee Stacie Coppock as to Plaintiff's PIP progress and stated that Plaintiff "is slated to start her STD/FMLA on 6/17 and [she] know[s] the business would like to have this wrapped up before

then if possible." (Doc. 27-19, p. 2.) While this email indicates Defendant knew of Plaintiff's FMLA leave request prior to her termination, it does not create an inference that Plaintiff was terminated *because* of her FMLA leave request. In fact, the email presents evidence supporting Defendant's argument that Defendant would have terminated Plaintiff for failure to successfully complete her PIP even if Plaintiff had not requested FMLA leave.

Plaintiff has thus failed to present a "convincing mosaic" of circumstantial evidence that supports her ADA and FMLA retaliation claims and could allow a reasonable jury to infer retaliation. Because Plaintiff's retaliation claims accordingly cannot survive summary judgment under either applicable theory, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's ADA retaliation claim (Count II) and FMLA retaliation claim (Count IV).

## IV. FMLA Interference Claim (Count III)

To bring a claim of FMLA Interference, a plaintiff must satisfy three elements. "First, she must show that she was entitled to a benefit under the FMLA. Second, she must show that her employer denied her that benefit. And finally, she must demonstrate harm, or prejudice, resulting from the employer's interference with her exercise (or attempted exercise) of an FMLA benefit." Graves v. Brandstar, Inc., 67 F.4th 1117, 1121 (11th Cir. 2023) (internal quotations and citations omitted). Plaintiff does not have to allege that Defendant intended to deny her right to FMLA leave because "the employer's motives are irrelevant." Strickland v. Water Works and Sewer Bd. of Birmingham, 239 F.3d 1199, 1208 (11th Cir. 2001). That Defendant terminated Plaintiff before she could begin her FMLA leave does not foreclose Plaintiff's FMLA interference claim. Benz v. Crowley Mar. Corp., 732 F. App'x 794, 804 (11th Cir. 2018). An employer may terminate an employee, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee "would have been dismissed regardless of any request for

FMLA leave." Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1236 (11th Cir. 2010). Similarly, even "[i]f the employer interfered with the plaintiff's FMLA rights, the employer can escape liability by showing that it would have terminated the employee for reasons unrelated to any FMLA leave." Benz, 732 F. App'x at 804.

Defendant avers that it had a legitimate, non-retaliatory reason for terminating Plaintiff and that it has shown that it would have terminated Plaintiff even in the absence of her FMLA leave request. (Doc. 22, p. 22; doc. 32, p. 12.) Plaintiff does not address Defendant's arguments and instead states that "she clearly establishes her claim of FMLA interference" because "Defendant terminated [Plaintiff's] employment on June 10, 2024, approximately seven (7) days prior to when her FMLA leave was set to begin." (Doc. 27, pp. 22–23.) Because Defendant has shown that it would have terminated Plaintiff for reasons unrelated to her FMLA leave request, see Discussion Section III.C, supra, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's FMLA interference claim (Count III).

## V. Sexual Harassment in Violation of Title VII (Count VII)

While "sexual harassment" is not explicitly mentioned in Title VII, the Eleventh Circuit Court of Appeals has clarified that sexual harassment can constitute discrimination based on sex for purposes of Title VII. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc). To establish a claim for sexual harassment under Title VII, a plaintiff must allege facts showing: (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of employment; and (5) there is a basis for holding the employer liable. Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1244 (11th Cir. 2004).

Plaintiff's claim is premised upon the text messages sent to her by Romagnino. Defendant argues that Plaintiff has failed to provide a basis for holding Defendant liable. (Doc. 22, pp. 25–26.) "Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002) (citing Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000)). The "remedial action" must be "reasonably likely to prevent the misconduct from recurring." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996) (quoting Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir.1990)).

On February 27, 2024, Plaintiff sent Hall and Outlaw an email reporting that she had a complaint of sexual harassment to make against her coworker, Romagnino. (Doc. 28, p. 19; doc. 22-13; doc. 22-19, p. 3; doc. 22-20, p. 2.) Outlaw and her supervisor, Pollett, investigated the allegations. (Doc. 28, p. 21; doc. 22-14; doc. 22-20, p. 2; doc. 22-21, p. 3.) On March 13, 2024, Outlaw and Pollett found that Plaintiff's allegations against Romagnino were substantiated and recommended termination. (Doc. 28, pp. 22–23; doc. 22-14; doc. 22-20, p. 3; doc. 22-21, p. 3.). Shortly, thereafter, Romagnino was terminated. (Doc. 28, p. 23; doc. 22-20, p. 3; doc. 22-21, p. 3.)

Plaintiff argues that "while Defendant's investigation into Romagnino's sexual harassment of [Plaintiff] yielded the proper result—termination of his employment—the investigation itself involved irregularities." (Doc. 27, p. 12.) Plaintiff provides the example that "there is no evidence in the record establishing that Defendant interviewed Welch[, a potential witness,] as part of its investigation into Romagnino's conduct." (Id. at p. 13.) "But where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the

process under which those measures are adopted ring hollow." Walton, 347 F.3d at 1288. Because Defendant promptly investigated Plaintiff's complaint and terminated the harasser, Plaintiff's sexual harassment claim under Title VII fails. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Count VII.

## CONCLUSION

In sum, Plaintiff has failed to raise a genuine issue of material fact that her employment was terminated because of gender or her perceived disability, or because she engaged in conduct protected under the ADA, Title VII, or the FMLA. The Court accordingly **GRANTS** Defendant's Motion for Summary Judgment on all counts. (Doc. 22.) With no further claims remaining, the Court **DIRECTS** the Clerk of Court to enter the appropriate judgment and to **CLOSE** this case.

**SO ORDERED**, this 30th day of September, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA